AMY HARMAN BURKART (Mass Bar No. 651828)
Email: BurkartA@sec.gov
KATHLEEN BURDETTE SHIELDS (Mass Bar No. 637438)
Email: ShieldsKa@sec.gov
WILLIAM J. DONAHUE (Mass Bar No. 631229)
Email: DonahueW@sec.gov
ALICIA REED (NY Bar No. 4913596)
Email: ReedA@sec.gov
AMY GWIAZDA (Mass Bar No. 663494)
Email: GwiazdaA@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Telephone: (617) 573-8900
Facsimile: (617) 573-4590

Local Counsel
KATHRYN WANNER (CA Bar. No. 269310)
Email: WannerK@sec.gov
Securities and Exchange Commission
444 S. Flower St., Suite 900
Los Angeles, CA 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

   vs.

DAVID STEPHENS, DONALD LINN DANKS, JONATHAN DESTLER, and ROBERT LAZERUS,

      Defendants, and

DANIEL SOLOMITA and 8198381 Canada, Inc.

      Relief Defendants.

Case No. **'22 CV 1483 AJB DEB**

**COMPLAINT**

1

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a)], and Sections 21(d), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a)].

2.      David Stephens, Donald Linn Danks, Jonathan Destler, and Robert Lazerus (collectively the "Defendants") have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendants Danks, Destler, and Lazerus reside in this district.

## SUMMARY

4.      This is a securities enforcement action.  From at least 2014 to at least November 2018 (the "Relevant Period"), Stephens, Danks, and Destler engaged in a deceptive scheme to sell publically traded stock in Loop Industries, Inc. ("Loop"), while concealing their ownership of the stock and connections with the company.  Lazerus worked with the group to further the scheme by helping to increase demand for Loop stock by promoting it and brokering sales to a number of investors, including to an elderly investor who invested millions

of dollars in Loop at the same time that the group was covertly selling the stock.

5.      In the course of the scheme, Stephens, Danks, Destler, and Lazerus all worked to further the fraud by engaging in deceptive conduct—including by seeking to evade securities law disclosure, registration, and reporting requirements—to conceal their ownership of Loop stock.  Danks was a member of the Board of Directors of Loop, and Danks and Destler made specific material misrepresentations to brokerage firms to conceal Danks' connections to the company.  In addition, Lazerus failed to meet the broker registration requirements of the securities laws by regularly selling Loop securities without registering with the Commission as a broker.

6.      As a result of the Defendants' deceptive scheme, investors buying Loop stock during the Relevant Period were deprived of important information: (1) that Stephens, Danks, and Destler were working as a coordinated group to hide their ownership and collective control of significant amounts of Loop stock; and (2) that members of the group, assisted by Lazerus, were encouraging others to buy Loop stock at the same time that they were surreptitiously selling it.

7.      Over the Relevant Period, working together, these Defendants generated millions of dollars in proceeds from fraudulently selling Loop stock.

8.      As a result of their conduct alleged herein, Stephens, Danks, Destler, and Lazerus violated Sections 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder;  Danks and Destler violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder; and Lazerus violated Section 15(a) of the Exchange Act.

9.      The Commission seeks a permanent injunction against the Defendants, enjoining them from engaging in transactions, acts, practices, and courses of business of the type alleged in this Complaint, disgorgement of all ill-

gotten gains from the unlawful conduct set forth in this Complaint pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)], together with prejudgment interest, civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; an order barring all Defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)]; an order barring Stephens, Danks, and Destler from serving as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)]; and such other relief as the Court may deem appropriate.

10.    The Commission also seeks relief against Daniel Solomita and 8198381 Canada, Inc. (together, the "Relief Defendants"), who received proceeds of the Defendants' unlawful acts, practices and schemes and should not be entitled to retain those illegally-derived proceeds.

## DEFENDANTS

11.    **David Stephens**, age 66, is a Canadian citizen believed to be residing in Vancouver, British Columbia.

12.    **Donald Linn Danks**, age 65, is a resident of Newport Beach, California and was a member of the Board of Directors of Loop from June 2015 to June 2018.

13.    **Jonathan Destler**, age 58, is a resident of Los Angeles, California.

14.    **Robert Lazerus**, age 66, is a resident of Solana Beach, California.

## RELIEF DEFENDANTS

15.    **Daniel Solomita,** age 46, lives in Quebec, Canada and is the President, Chief Executive Officer, and Director of Loop.

16.    **8198381 Canada, Inc.,** is a Quebec, Canada corporation

headquartered in Montreal, Quebec which is wholly owned by Solomita.

## RELATED ENTITIES

17.     **Loop Industries, Inc**., is a Nevada corporation headquartered in Terrebonne, Quebec, Canada whose shares have traded on the Nasdaq Global Market exchange since November 20, 2017 under the symbol LOOP.  Prior to trading on NASDAQ, Loop stock traded on OTC Link, operated by OTC Markets Group, Inc., from November 2015 to November 19, 2017 under the symbol LLPP.  Loop describes itself as a plastics recycling company whose proprietary technology focuses on recycling no- and low-value waste plastic and polyester fiber into resin that is suitable for use in food-grade packaging and polyester fiber.  Loop's common stock (through its predecessor entities) has been registered with the Commission pursuant to Section 12(g) of the Exchange Act since 2012.

18.     **Touchstone Advisors, Inc.**, is a Nevada corporation incorporated in 2008 and headquartered in Los Angeles, California.  Touchstone Advisors purportedly serves as an advisory firm focused on assisting early stage companies in all aspects of development, including helping move companies into public markets and preparing companies for uplisting to major exchanges.  According to corporate filings, Touchstone Advisors is owned and operated by Destler and a relative.  Danks and Destler are Managing Partners of Touchstone Advisors and they jointly control at least one financial account.  Touchstone Advisors is not registered with the Commission in any capacity.

19.     **Touchstone Holding Company, LLC** is a limited liability company formed in 2017 in California.  Destler and Touchstone Advisors are both members of Touchstone Holding Company.

20.     **Ventanas Capital, LLC** is a limited liability company formed in 2014 in Nevada.  Person B is the sole member of Ventanas, but Danks has exerted control over one or more of its brokerage accounts.

5

21.     **Vertical Leap Advisors LLC** is a limited liability company formed in 2010 in Nevada, jointly controlled by Destler and Danks.

## BACKGROUND

22.     Persons who control companies which have stock that is sold to the public are subject to a variety of legal and regulatory requirements. Such registration requirements, sale restrictions, and disclosure obligations are safeguards designed to inform investors about the nature of the stock they are holding or considering buying, and from whom they would be buying that stock.

23.     Before selling stock, control persons are required to: (a) register the stock sales with the Commission pursuant to Section 5 of the Securities Act [15 U.S.C. § 77e]; (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R. § 240.144], including limitations on the amount of stock a control person can legally sell.  Also, investors in certain public companies are required publicly to disclose any ownership interest in excess of 5% of the company's publicly traded stock.

24.      "Restricted stock" includes stock of a company whose shares are traded publicly (also known as an "issuer") that has been acquired from an issuer, or an affiliate of an issuer, in a private transaction that is not registered with the Commission.  In addition, stock held by an issuer or affiliate of an issuer is restricted stock.  Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).  A registration statement contains important information about an issuer's business operations, financial condition, results of operations, risk factors, and management.  It also includes disclosure of any person or group who is the beneficial owner of more than 5% of the company's securities.

25.     An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer.  "Control" means the power to direct management and policies of the company in question.  Affiliates include officers, directors and controlling shareholders, as well as any person who is under "common control" with or has common control of an issuer.  As used herein, the term "control group" means a group that collectively is an "affiliate" of an issuer.

26.     "Unrestricted stock" is stock that may legally be offered and sold in the public securities marketplace by a non-affiliate, ordinarily after having previously been subject to a registration statement.  Registration statements are transaction specific, however, and apply to each separate offer and sale as detailed in the registration statement.  Registration, therefore, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties. Thus, when a control person buys publicly-traded or otherwise unrestricted shares in a company s/he controls, those shares automatically become subject to the legal restrictions on sales by an affiliate, which strictly limit the quantity of shares that may be sold in the public markets absent registration.  Without registration, affiliates are prohibited from selling large quantities of an issuer's shares, regardless of how the affiliates obtained those shares.

27.     A "transfer agent" is a company that, among other things, issues and cancels certificates of a company's stock to reflect changes in ownership. Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock.  Transfer agents routinely keep track of whether shares are restricted from resale.

28.     A "shell company" is a legal entity that lacks meaningful assets or business operations. In a scheme to profit from such companies without actually

commencing business operations, individuals sometimes file materially false registration statements and other filings to make company shares appear to be eligible for public trading and quotation. Such "clean" shells, as they are called, may be sold for substantial sums.

29.     OTC (Over-the-Counter) Markets Group, Inc. is a stock quotation service that facilitates public trading of shares in public companies that are not otherwise listed on national securities exchanges (like NASDAQ or the New York Stock Exchange).

30.     "Penny Stock," as used herein, generally refers to a security issued by a very small company that trades at less than $5 per share.

## FACTUAL ALLEGATIONS

**A.     The Fraudulent Scheme by Stephens, Danks, and Destler to Conceal Control of Loop While Selling Loop Stock**

**1.     Stephens gained control of all the unrestricted shares of Loop stock while concealing his ownership.**

31.     Stephens, Danks, and Destler engaged in a series of actions in approximately 2014 and 2015 designed to provide Stephens with control of all the unrestricted shares of Loop stock while concealing his ownership.

32.     The Defendants' scheme was facilitated by individuals whose business involved facilitating securities fraud schemes, including by creating public shell companies that can be acquired by individuals or groups seeking to hide their beneficial ownership and control of a company.[1]

33.     Prior to the Defendants' involvement in the fraud, a publicly traded shell company named First American Group, Inc. ("First American") was created. Through a series of transactions between 2012 and 2013, all of the

---

[1] Most of these entities or the persons controlling them have been previously charged by the Commission for facilitating illegal penny stock securities sales. *See SEC v. Bajic, et al.,* No. 20-cv-007 (S.D.N.Y. filed Jan. 2020); *SEC v. Sharp et al.*, No. 21-cv-11276 (D. Mass. filed August 2021).

unrestricted shares of First American were transferred into eleven different offshore nominee entities. Each of these nominee entities appeared to be administered by a different owner, but in fact they were all under common control.

34.     In approximately 2014, Stephens acquired the First American shell, covertly obtaining control of the eleven nominee entities.

35.     Destler and Danks are long-time business associates. On October 3, 2014, Destler, copying Danks, introduced Stephens to Relief Defendant Daniel Solomita, at Loop Holdings, Inc., describing Stephens as a "close contact" and the "principal representing a public shell candidate we are looking to secure." The same day, Touchstone Advisors, Inc. ("Touchstone Advisors") (a Danks/Destler entity) entered into a consulting and advisory agreement with Loop Holdings. Thereafter, Stephens worked with Destler, Danks, and Solomita to explore the possibility of merging his public shell company, First American, with Loop Holdings. Eight months later, in June 2015, First American successfully completed a reverse merger with Loop Holdings. In September 2015, the surviving public company changed its name to Loop Industries, Inc. ("Loop"). At that time, Loop was a penny stock trading on OTC Link.

36.     As a result of the reverse merger, all of the purportedly unrestricted shares of First American stock covertly held by Stephens became purportedly unrestricted shares of Loop, and they collectively represented _all_ of the outstanding unrestricted shares of Loop.

37.     Stephens, who had the authority to direct each of the eleven nominee entities, thus controlled all of the approximately 6.5 million outstanding unrestricted shares of Loop, which had become a publicly traded company through the reverse merger. But, by design, these shares all appeared to be owned by unrelated entities that held less than five percent of the stock. Each entity thus appeared to avoid the threshold for reporting their beneficial

ownership of Loop stock under the relevant provisions of the Exchange Act. Further, this structure allowed the entities to avoid scrutiny by brokerage firms, which often apply a higher level of scrutiny to stock ownership positions over five percent of a public company.

38.     As a result of these actions, Stephens was able to deliberately conceal from transfer agents, broker-dealers, and other market participants the fact that he was the beneficial owner and controlling shareholder of all of the outstanding shares of the purportedly unrestricted Loop stock.

39.     At the time of the reverse merger between Loop and First American, in June 2015, Solomita became Chief Executive Officer and President of Loop and Chairman of the Board of Directors.  At the same time, Danks became a member of the Loop Board of Directors.  The Loop Board of Directors consisted of only a small number of individuals, and it was a position of trust and confidence.

40.     Destler and a relative own Touchstone Advisors, and Danks is a Managing Director of the company.  Destler and Touchstone Advisors are also members of Touchstone Holding Company, LLC ("Touchstone Holding").  In addition, Danks and Destler jointly control another limited liability company, Vertical Leap Advisors LLC ("Vertical Leap").  At the time of the reverse merger, the corporate address for Loop in Los Angeles, California was the same corporate address listed for Touchstone Advisors, Vertical Leap, and other companies connected to Destler and Danks.  Thus, by mid 2015: Stephens covertly owned all of the unrestricted shares of Loop stock; Danks was a Loop board member; and Destler was a business partner of Danks and a consultant to Loop.

41.     After the reverse merger, Stephens transferred Loop stock to Danks and Destler, and Stephens, Danks, and Destler worked together to continue to conceal their ownership of the stock.

42.     Starting in late 2015, Stephens transferred some of the Loop stock that he held through his nominee entities to Danks and Destler.  For example:

 a) In or about November 2015, one of the Stephens-controlled nominee entities transferred 225,000 Loop shares to Vertical Leap, and 250,000 Loop shares to a trust for the benefit of Danks' family.

 b) On or about November 3, 2015, a different Stephens-controlled nominee entity transferred 700,000 Loop shares to Touchstone Advisors.

 c) On or about November 5, 2015, another Stephens-controlled nominee entity transferred 100,000 Loop shares to Touchstone Advisors and 350,000 Loop shares to Vertical Leap.

 d) On or about February 16, 2016, another Stephens-controlled nominee entity transferred 500,000 purportedly unrestricted Loop shares to Danks and 50,000 shares to Lazerus.

43.     The manner in which these initial transfers were made—to multiple entities and often with little to no compensation—demonstrates that, after the merger, Stephens, Danks, and Destler were working together in a coordinated manner for the common purpose of hiding the ownership of large amounts of Loop stock.

44.     Stephens, Danks, and Destler, as a control group working together, were affiliates of Loop and exercised control over the company.  They each knew or were reckless in not knowing that, as a result, they were subject to certain disclosure, registration, and reporting requirements under the Securities Act and the Exchange Act.  They also knew or were reckless in not knowing that if the extent of their ownership and control of Loop stock was known by market participants, their sales would be subject to additional scrutiny, which might

11

adversely affect the price of the stock and potentially impact their ability to sell the stock into the market.

45.     Stephens, Danks, and Destler thus engaged in a scheme, knowingly, recklessly, and/or negligently, to avoid those requirements, and to hide their control of the company from investors, securities market intermediaries, and securities regulators, and profit from the scheme by covertly selling Loop stock.

46.     Stephens continued to make transfers of Loop shares, both personally and through nominee entities, to entities controlled by Danks and Destler, until at least October 2017.

**2.      Danks and Lazerus engaged in market manipulation and took advantage of an elderly investor to increase the price of Loop stock in furtherance of the fraud.**

47.     Lazerus provided assistance to Danks and Destler in finding investors for Danks' and Destler's shared business ventures, including Loop.  In return for his services, Lazerus received a commission for sales of stock made to investors he solicited in the form of either cash payment or shares of stock. Lazerus found investors to buy Loop's stock in the public markets and in private sales/and or issuances.  These investors included an elderly investor ("Elderly Investor") who invested over $7 million in Loop by the end of the Relevant Period.

48.     Lazerus had a relationship of confidence with, and exerted significant influence over, the Elderly Investor from 2015 to 2019.  Stephens, Danks, and Destler repeatedly took advantage of that relationship to further their fraudulent scheme.

49.     During 2017 (and at times during subsequent periods), Danks and Lazerus engaged in a concerted effort to time the purchases made by the Elderly Investor as a means of supporting Loop's share price.  This activity benefited

12

Loop not only by raising its stock price generally, but also by supporting its application to move trading of the stock from trading on the OTC Markets to trading on the NASDAQ exchange, a move (or "up-list") that itself had a beneficial impact on the value of Loop's stock.

50.     Specifically, on 26 trading days between March and December 2017, the Elderly Investor's purchases were greater than 50% of the market volume for Loop's shares.  The Elderly Investor's actions played a significant role in raising the value of Loop's stock.  The chart below illustrates the volume of purchases by the Elderly Investor and the impact on Loop stock price in 2017.



51.     Danks communicated directly with Lazerus to ask him to encourage the Elderly Investor to purchase stock on specific days.  Danks did this for the purpose of raising the stock price of Loop, so that he and his

associates, Destler and Stephens, could then sell the stock for a higher profit, and in order to support the uplisting of the stock.  Lazerus was aware that this was Danks' intention, and he encouraged the Elderly Investor to make the purchases to achieve this goal.

52.     For example, on November 1 and 2, 2017, as the stock was being actively evaluated for uplisting to the NASDAQ exchange Danks sent a series of messages to Lazerus trying to encourage him to get the Elderly Investor to buy stock:

| Date | Communication |
| --- | --- |
| 11/1/2017 | "Robert, Can u get [Elderly Investor] to buy 4-5k shares a day for next week or so?  Thx.  Call u around noon with some updates" |
| 11/2/2017 | "Any luck with [Elderly Investor] in the market…We need the stock to firm up at about $13-$14" |
| 11/2/2017 | "???We're negotiating with lender and need price up to set warrant prices.  Let me know if [Elderly Investor] can help…" |

53.     While the Elderly Investor was purchasing shares, Stephens, Danks, Destler, and/or Lazerus were often selling Loop shares.  Between April and November 2017, on 112 of the 166 trading days, the Elderly Investor bought Loop stock on the same day that Stephens, Danks, Destler or Lazerus sold Loop in their respective accounts.  During that period, the Elderly Investor purchased $3.2 million worth of Loop stock in the open market.  During the same time period, he spent $1.8 million purchasing Loop stock in private transactions with Danks, Destler, and Lazerus.

54.     Danks and Destler, through entities they controlled, compensated

Lazerus for the Elderly Investor's securities transactions either with a commission paid in cash or in Loop stock.

**3.** **Stephens, Danks, and Destler sold Loop Stock into the Public Markets while concealing their ownership.**

55.     In addition to the sales they made directly to the Elderly Investor and others in private transactions, Stephens, Danks, and Destler sold Loop stock in the public markets using a network of entities owned and controlled by Stephens, Danks, and Destler.

56.     Stephens, Danks, and Destler knew or were reckless in not knowing about the disclosure, registration, and reporting requirements that are triggered under the federal securities laws for sales by individuals or entities that are affiliates of a public company.  They also knew or were reckless in not knowing about the increased scrutiny from brokerage firms for owners of over five percent of a company's stock.  Moreover, they knew or were reckless in not knowing that beneficial owners of more than five percent of any class of equity securities must file ownership reports with the SEC.  In order to evade these requirements, Stephens, Danks, and Destler worked together to hide the true beneficial ownership of the Loop stock they collectively controlled.  They did this in part by transferring and selling stock between the entities that they controlled, often for little to no compensation.  Thus, when they sold the stock of Loop, the purchasers were not aware that they were buying shares from individuals that, collectively, controlled Loop.

57.     For instance, Stephens had an ongoing business relationship with Associate A, who was one of the people who provided Stephens with some of the 11 nominee entities Stephens used from the outset of his scheme to conceal the ownership of his unrestricted Loop stock.  Stephens directed Associate A to sell some of his Loop shares into the United States public market using nominee entities Associate A controlled.  Between October 2017 and February 2018,

Associate A used a Singaporean brokerage account to sell Stephens' Loop shares for proceeds of $1,684,000.  Associate A then wired about 95% of those proceeds to Stephens' bank account and kept the balance of the proceeds.  In another instance, Stephens acquired multiple blocks of Loop shares from four of the eleven nominee companies, for no apparent consideration, into his own name, and then transferred the stock into the name of a nominee company that Associate A controlled.  Using a Hong Kong brokerage account, Associate A then sold that stock into the United States market on Stephens' behalf between June and August 2017, generating proceeds of about $1.1 million.  Associate A then retained a 4% commission and remitted the net proceeds to Stephens' personal bank account.

58.     In another example of deceptive conduct, in the fall of 2017, Stephens transferred 122,650 shares of Loop stock he had previously acquired in his own name from three of the original eleven nominee entities he controlled to Touchstone Advisors, which was controlled by Destler and Danks.  Several days later, Touchstone Advisors, brokered by Lazerus, sold all of those shares to the Elderly Investor for $1,410,475.  Touchstone Advisors then wired $1,318,487 of the sale proceeds to Stephens, keeping $91,988 in profit.  A third of that profit was paid to a trust for the benefit of the Danks family, and a third of the profit was paid to Lazerus, in exchange for brokering the sale with the remaining third left in the Touchstone bank account which was controlled, in part, by Destler. The entire transaction was designed so that Stephens, Danks, and Destler, aided by Lazerus, could sell Loop stock to the Elderly Investor without him knowing that the stock he was buying was being sold by individuals who collectively controlled the company.

59.     Another entity used by the group to hide their ownership and control of Loop stock was Ventanas Capital LLC ("Ventanas").  The nominal owner of Ventanas, Person B, maintained a long-time friendship and close

association with Danks.  Danks exercised control over Ventanas' brokerage account both directly and indirectly, through his relationship with Person B.

60.     For example, Ventanas began acquiring Loop shares in October 2015, both directly from the Stephens-controlled nominee entities and from Vertical Leap, which was owned by Danks and Destler.  In 2016, Ventanas received Loop shares from Touchstone Advisors, Vertical Leap, and a trust for the benefit of the Danks family.  For each acquisition, there is either no evidence that Ventanas paid for the shares it received, or there is evidence that Ventanas' purchase price was significantly below the market value of Loop stock at the time of the transaction.  Ventanas' sales provided Danks with a way to sell those securities that would conceal his effective ownership and control of them.

## B.    Danks and Destler Made Material Misrepresentations in Furtherance of the Fraud.

61.     Danks and Destler each made materially false statements to brokerage firms in furtherance of the fraudulent scheme when they either opened, or obtained authority to trade in, accounts through which they sold Loop shares.

62.     Specifically, in May 2017, Person B granted authority to Danks to serve as a Limited Power of Attorney ("LPOA") over Ventanas' account, giving Danks trading authority over its brokerage account.  When Danks was added as a LPOA over Ventanas' brokerage account, Danks falsely represented to the brokerage firm in the application that he was not a director of a publicly held company, when he was in fact a member of Loop's board of directors.  At the time Danks made this statement, he knew it was false, because he was on the board of directors of Loop.   At that time, Loop was the **only** stock held by the Ventanas account.

63.     This false statement to the brokerage firm that he was not a director was material because the brokerage firm would reasonably evaluate the

fact that Danks was on Loop's board of directors in determining whether to accept the deposit of Loop shares and whether to allow Danks to trade in Loop shares without additional scrutiny.

64.     Destler also made materially false statements in furtherance of the fraudulent scheme.  Specifically, in July 2015, just after Loop's reverse merger, when Danks became a board member of Loop, Destler opened two brokerage accounts at a brokerage firm – one in the name of Vertical Leap (on which he listed Danks and himself as members) and a second in the name of Touchstone Advisors (on which Destler omitted Danks' name).  In December 2015, Destler deposited 150,000 shares of Loop into the Touchstone Advisors account.  These shares were transferred from a Stephens-controlled nominee entity.  Touchstone Advisors previously acquired these purportedly unrestricted shares from one of the Stephens nominee entities for $0.008/share.  In connection with this deposit, Destler made multiple misrepresentations to the brokerage firm including:

a)  Destler misreported the total number of Loop shares Touchstone Advisors owned at the time of the deposit. Destler stated that Touchstone owned 1,300,000 Loop shares (4.4% of Loop's outstanding stock) when it actually owned 1,800,000 shares (6.1% of Loop's outstanding stock).  This misrepresentation allowed Destler to appear to avoid the reporting requirements for an owner of 5% or more of the outstanding stock.

b)  Destler answered "No" to the question of whether "[a]t the time of Customer's acquisition, was the Transferor an 'affiliate' of the Issuer or had the Transferor been an 'affiliate' at any time during the preceding 90 days."  The Transferor in this instance was Stephens through a nominee entity.  Destler knew that this statement was false, because

18

Stephens (as part of a group with both Danks and Destler himself), was an affiliate of Loop by virtue of the group's ownership and control of Loop.

c) Destler made a statement to the brokerage firm concerning the nominee entity not being an affiliate of Loop by supplying a letter purportedly signed by the nominee entity in which that entity falsely disclaimed affiliate status.

65.     Destler signed a certification under the pains and penalty of perjury confirming that all the information he provided "is and will be accurate and complete."  In fact, Destler knew that each of these statements was inaccurate and/or incomplete, or was at least reckless with respect to the falsity of these statements.  The statements and omissions were material because the brokerage firm would reasonably evaluate that information in determining whether to accept the deposit of Loop shares and whether to allow Destler to trade in Loop shares without additional scrutiny.

## C.     Lazerus Acted as an Unregistered Broker-Dealer

66.     During the course of the scheme, Lazerus acted as an unregistered broker.  He regularly sold Loop securities to the Elderly Investor and other investors for transaction-based compensation based on a percentage of the sale proceeds or in exchange for Loop stock, as described in paragraphs 47-54 herein. He also advised the Elderly Investor and other investors concerning the merits of their Loop investments, and spent significant effort to solicit and recruit investors to buy Loop stock at the request of Danks and Destler.  Some of the Elderly Investor's Loop securities were even delivered to Lazerus for the benefit of the Elderly Investor, and were accompanied with correspondence that described Lazerus as the Elderly Investor's "financial advisor."  Lazerus also sold securities of additional issuers associated with Danks and Destler to the Elderly Investor and other investors.

67.     Lazerus was not registered as a broker-dealer at the time of this activity.

**D.     The Defendants and Relief Defendants Profited from the Scheme.**

68.     As a result of their fraudulent and deceptive conduct, Stephens, Danks, and Destler were able to engage in manipulative activity and sell Loop stock without disclosing their ownership and control of the company.

69.     Stephens fraudulently sold Loop's purportedly unrestricted stock in public market sales through the nominee entities, and in private sales to the Elderly Investor, which were brokered through Lazerus and Touchstone Advisors.  In order to further obfuscate his identity, in some instances Stephens directed that the profits from his Loop stock sales be directed to pay third parties for services for the benefit of Stephens' family.  In total, Stephens made approximately $4.7 million in profits by selling Loop stock while hiding his control of the company.

70.     Danks and Destler also made significant profits by surreptitiously selling Loop stock.  Lazerus made approximately $30,000 in commissions by assisting Stephens, Danks, and Destler in the fraudulent sale of Loop stock. Lazerus also received Loop stock from Stephens, Danks, and Destler as compensation for assisting them in their fraudulent scheme.  For instance, on July 27, 2017, Lazerus was given 1,457 shares of Loop common stock as compensation for facilitating shares of Loop to the Elderly Investor.

71.     As described above, Solomita became the CEO and President of Loop and Chairman of the Board of Directors at the time of the reverse merger, in 2015.  On or about October 20, 2015, after Ventanas acquired unrestricted Loop stock from Stephens' nominee entities, Danks helped arrange the sale of 400,000 of Ventanas' shares to a Quebec Company, Company A.  Company A paid Ventanas $437,490 for the shares on October 20, 2015.  Two days later, Ventanas wired $413,875 (representing 95% of the proceeds) to 8198381

Canada, Inc., Solomita's company.

72.     While emails between Danks and Solomita characterize the above payment as a "loan," there is no evidence that this purported loan was ever memorialized in writing or repaid.  There is also no evidence that Loop or Solomita earned the funds and thus has a legitimate claim.  The payment represents proceeds from the fraudulent scheme – a transfer of Ventanas' assets from Danks to Solomita in a manner designed by the Defendants to hide the origin of the funds.

## FIRST CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a)(1) and (3) of the Securities Act

### (against Defendants Stephens, Danks, Destler, and Lazerus)

73.     The SEC realleges and incorporates by reference paragraphs 1 through 72 above.

74.     By reason of the conduct described above, Defendants Stephens, Danks, Destler, and Lazerus, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

75.     Defendants Stephens, Danks, Destler, and Lazerus, with scienter, employed devices, schemes and artifices to defraud; and with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

76.     By reason of the conduct described above, Defendants Stephens, Danks, Destler, and Lazerus violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §77q(a)(1) and (3)].

## **SECOND CLAIM FOR RELIEF**

**Fraud in Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)**

**(against Defendants Stephens, Danks, Destler, and Lazerus)**

77.     The SEC realleges and incorporates by reference paragraphs 1 through 72 above.

78.     By reason of the conduct described above, Stephens, Danks, Destler, and Lazerus, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

79.     By reason of the conduct described above, defendants Stephens, Danks, Destler, and Lazerus violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a) and (c)] thereunder.

### THIRD CLAIM FOR RELIEF

**Misstatements**

**Violation of Section 10(b) of the Exchange act and Rule 10b-5(b)**

**(against Defendants Danks and Destler)**

80.     The SEC realleges and incorporates by reference paragraphs 1 through 72 above.

81.     By reason of the conduct described above, Defendants Danks and Destler, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mails, made untrue statements of material fact or omitted to state material fact(s) necessary to make the statements made not misleading in light of the circumstances under which they were made.

82.     By reason of the conduct described above, Defendants Danks and Destler violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. §240.10b-5(b)].

# FOURTH CLAIM FOR RELIEF

## Violation of Section 15(a) of the Exchange Act

## (against Defendant Lazerus)

83.     The SEC realleges and incorporates by reference paragraphs 1 through 72 above.

84.     Defendant Lazerus, by engaging in the conduct described above, either directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities, without being registered as a broker or dealer in accordance with Section 15(b) of the Exchange Act [15 U.S.C. §78o(b)].

85.     By reason of the conduct described above, Lazerus violated and, unless enjoined, will continue to violate Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)(1)].

# FIFTH CLAIM FOR RELIEF

## OTHER EQUITABLE RELIEF INCLUDING UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST (against Relief Defendants)

86.     The SEC realleges and incorporates by reference paragraphs 1 through 72 above.

87.     Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)] states "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

88.     The Relief Defendants have received funds derived from the unlawful acts, practices and scheme of the Defendants under circumstances dictating that, in equity and good conscience, they should not be allowed to retain such funds.

89.     Further, specific property acquired or improved by the Relief Defendants is traceable to Defendants' wrongful acts, and there is no reason in equity why the Relief Defendants should be entitled to retain that property.

90.     As a result, the Relief Defendants are liable for unjust enrichment and should be required to return their ill-gotten gains, in an amount to be determined by the Court.  The Court should also impose a constructive trust on property in the possession of the Relief Defendants that is traceable to the Defendants' wrongful acts.

# **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

## **I.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Stephens, Danks, Destler, and Lazerus, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **II.**

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Lazerus, and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 15(a) of the Exchange Act.

## **III.**

Order Defendants and Relief Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon, pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)].

## **IV.**

Order Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## V.

Enter an order barring Defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

## VI.

Enter an order barring Defendants Stephens, Danks and Destler from serving as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.


## <u>JURY DEMAND</u>

The Commission demands a jury in this matter for all claims so triable.


Dated:   September 30, 2022

*s/ Kathryn Wanner*
_____

KATHRYN WANNER
(CA Bar. No. 269310)
Local Counsel
Email: WannerK@sec.gov
Securities and Exchange Commission
444 S. Flower St., Suite 900
Los Angeles, CA  90071
Telephone: (323) 965-3998Facsimile:
(213) 443-1904

28

AMY HARMAN BURKART (Mass Bar No. 651828)
KATHLEEN BURDETTE SHIELDS (Mass Bar No. 637438)
WILLIAM J. DONAHUE (Mass Bar No. 631229)
ALICIA REED (NY Bar No. 4913596)
AMY GWIAZDA (Mass Bar No. 663494)
(617) 573-8904 (Shields Direct)
(617) 573-5905 (Burkart Direct)
Facsimile: (617) 573-4590

Attorneys for Plaintiff
Securities and Exchange Commission